[Civ. No. 22046. Third Dist. Feb. 3, 1984.]

RITA MILLER et al., Plaintiffs and Appellants, v.
CALIFORNIA COMMISSION ON THE STATUS OF WOMEN,
Defendant and Appellant.

**COUNSEL**

Hunter, Peterson & Burton and Thomas M. Burton for Plaintiffs and Appellants.

George Deukmejian and John K. Van de Kamp, Attorneys General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Richard D. Martland, Assistant Attorney General, Paul H. Dobson and Marian M. Johnston, Deputy Attorneys General, for Defendant and Appellant.

Morrison & Foerster, William H. Alsup, Sandra P. Tichenor, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Judith E. Kurtz, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Marla J. Miller and Margreth Barrett as Amici Curiae on behalf of Defendant and Appellant.

**OPINION**

**BLEASE, J.**—Plaintiffs are disgruntled with the views and activities of the California Commission on the Status of Women (Gov. Code, § 8240),[1] chiefly its support of a proposed Equal Rights Amendment (ERA) to the federal Constitution. They filed this taxpayers' action for declaratory and

---

[1] All statutory references are to the Government Code, unless otherwise noted.

injunctive relief seeking to abolish the commission or, failing that, to prohibit it from lobbying or promoting its views concerning actions the commission deems appropriate to improve the status of women. The trial court denied relief aimed at abolition of the commission but granted judgment for plaintiffs encompassing the alternate relief they sought. The commission appeals from the judgment. Plaintiffs cross-appeal from the denial of their paramount request.

I

In 1965 the California Legislature adopted an act creating the Advisory Commission on the Status of Women to study various subjects, including employment conditions, relating to the equality of treatment of women and to report its recommendations to the Legislature. (Stats. 1965, ch. 1378, pp. 3283-3285.) In 1969 the Legislature amended the act to specify additional functions of the commission. (Stats. 1969, ch. 721, § 6, p. 1415.) In 1971, the act was amended to create the Commission on the Status of Women and to add yet other duties. (Stats. 1971, ch. 541, pp. 1050-1052.) The legislation was codified in the Government Code in 1977. (Stats. 1977, ch. 579, § 65, pp. 1857-1858.)

In 1972 the Legislature ratified the proposed ERA (Stats. 1972, res. ch. 148, pp. 3440-3441) which provides: "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." (*Ibid.*)[2] Plaintiffs filed the complaint in this action in November 1976, alleging the commission unlawfully promoted the ratification of the ERA in California and elsewhere and illegally urged conformity of California's laws to the ERA standard.[3] They claim any such promotion is ultra

---

[2]The California Constitution contains a similar guarantee of rights. (Cal. Const., art. I, §§ 7, 8; *Hardy* v. *Stumpf* (1978) 21 Cal.3d 1, 7 [145 Cal.Rptr. 176, 576 P.2d 1342]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].)

[3]The following is a synopsis of the allegations of plaintiffs' complaint. Prior to ratification of the ERA by California's Legislature the commission advocated this action to its members and to the public. In 1973 the commission "obtained passage" of Assembly Concurrent Resolution No. 33 creating a Joint Committee of Legal Equality. (See Stats. 1973, res. ch. 114, pp. 3242-3243, establishing a joint committee to study conforming California's laws "with the principle that equality of rights under the law shall not be denied or abridged on account of sex.") After 1973, the commission established a syndicated newspaper column entitled "A Woman Ought to Know" with a "partisan" slant in favor of the ERA and biased on other "political and controversial topics." Since 1973 the commission has prepared various materials for public consumption "to the end of implementing the legal and societal standards of the [ERA]." Since 1974 the commission has printed a newsletter for the purpose of supporting the ERA. In August of 1974 the newsletter stated falsely that legal authorities agree a state cannot rescind their ratification of the ERA. In January of 1975 the newsletter urged letters and contributions to the effort to obtain ratification of the ERA in seven other states. In August of 1975 the newsletter urged readers' attendance at an August rally at the State Capitol Building and subsequent visits to legislators to ask for legislation conforming California laws to the ERA and to oppose rescission of California's ratification of ERA.

vires or, alternatively, prohibited because it denies them constitutional rights to equal protection of the law and freedom of speech.

This court considered the controversy in *Miller v. Miller* (1978) 87 Cal.App.3d 762 [151 Cal.Rptr. 197] (*Miller I*) and reversed a summary judgment in favor of the commission, with two justices concluding the commission's "advocatory or promotional position on ERA" required " 'clear and explicit' legislative authorization," which had not been shown. (*Id.*, at pp. 771-772.) Thereafter, shortly after the rendering of the judgment here in issue, the Legislature enacted section 8246 (Stats. 1982, ch. 1118, § 1) which provides: "(a) The commission is expressly authorized to inform the Legislature of its position on any legislative proposal pending before the Legislature and to urge the introduction of legislative proposals.

"(b) The commission is expressly authorized to state its position and viewpoint on issues developed in the performance of its duties and responsibilities as specified in this chapter.

"(c) This section is declaratory of existing law."

■ The case, as framed by plaintiffs and the order of the court below, involves declaratory and injunctive relief that looks only to the future. Accordingly, we address the matter in the present tense, cognizant of the most recent expression of legislative will.[4] (See, e.g., *White v. Davis* (1975) 13 Cal.3d 757, 773 [120 Cal.Rptr. 94, 533 P.2d 222], fn. 8; cf. *Selby Realty Co. v. City of Buenaventura* (1973) 10 Cal.3d 110, 125 [109 Cal.Rptr. 799, 514 P.2d 111].)

In essence the judgment declares and orders that the commission must refrain from expressing to the Legislature or the public any opinion of its own on any issues of "[w]omen's educational and employment problems, needs, and opportunities." The commission is relegated thereby to the status of a librarian, a collector and indexer of data and opinions of others on these subjects. The authority advanced for this bar is *Miller I.*

*Miller I,* however, is no longer authority for such claims; the enactment of section 8246 has cut the ground from beneath it. The commission is now "expressly authorized to state its position and viewpoint on issues developed in the performance of its duties and responsibilities" (§ 8246, subd. (b)),

---

[4]We note the matter of attorney fees was reserved by the trial court. We intimate no view on the timing or resolution of that matter.

which are broadly set forth in section 8245.[5] The authorization for the commission to speak its mind "on issues" developed on these matters can only be interpreted as a legislative warrant to advocate and promote the commission's positions on these subjects.

Plaintiffs' sole rejoinder to the new legislation is the remarkable assertion that, notwithstanding the plain language of the statute, because subdivision (c) of section 8246 states the section is declaratory of existing law, the Legislature intended to endorse the judgment of the trial court.[6] Why the Legislature would have amended the statute to indulge a redundancy is not explained. The words read otherwise.

We do not imply that a legislative warrant for promotional activity is wholly insulated from all but constitutional reproof. We doubt the warrant was intended to authorize advocacy of election of candidates for public office based upon their stand on matters affecting the status of women. Be

---

[5]Section 8245 provides: "(a) The Commission shall study the following:

"(1) Women's educational and employment problems, needs, and opportunities.

"(2) State laws in regard to the civil and political rights of women, including pensions, tax requirements, property rights, marriage and dissolution of marriage provisions, and similar matters.

"(3) The effect of social attitudes and pressures and economic considerations in shaping the roles to be assumed by women in the society.

"(4) Any laws, practices, or conditions concerning or affecting women which impose special limitations or burdens upon them or upon society, or which limit or tend to limit opportunities available to women.

"(b) The commission shall act as an information center on the status of women and women's educational, employment, and other related needs.

"(c) The commission shall recommend, develop, prepare, or coordinate materials, projects, or other activities, and shall give technical and consultative advice to public or private groups or persons concerned with any of the following:

"(1) Preventing or minimizing problems brought about by the changing roles and responsibilities of women.

"(2) Developing programs to encourage and enable women to be fully contributing members of society.

"(d) A prime function of the commission shall be to encourage women's organizations and other groups to institute local self-help activities designed to meet women's educational, employment, and related needs. The commission shall make reports on its activities, findings, and recommendations to the Legislature from time to time, but not less often than every odd-numbered year."

[6]The legislative counsel's digest accompanying the bill would have led those legislators who read it to believe they were acting specifically to correct the existing case law:

"SB 1499, Rains. State agencies.

"Existing case law interprets the provisions of law applicable to the Commission on the Status of Women as not authorizing the commission to inform the legislature of its position on legislative proposals, or to express a particular viewpoint on issues within the scope of its responsibilities, among other things.

"This bill would expressly authorize the commission to inform the legislature of its position on pending legislative proposals, to urge their introduction, and to express a viewpoint on issues within the scope of its responsibilities." (Stats. 1982, ch. 1118.)

that as it may, no allegation of improper promotional activities is made out by plaintiffs' pleadings. Their complaint lies on a more generalized plane: that *any* advocacy or promotion by the commission of its views on such matters is prohibited. On that plane their remaining arguments are addressed to the Constitution. We turn to them.

## II

Plaintiffs make two constitutional claims in support of the judgment and in support of its extension to abolish the commission. They contend the very establishment of a commission on the status of women runs afoul of state and federal constitutional precepts of equal protection of the law. Alternatively, they contend permitting the commission to speak its views on controversial "women's issues" infringes their constitutional right to freedom of speech. Neither contention has merit.[7]

 Plaintiffs' equal protection contention is but an attempt to hoist the commission with its own petar. They reason "[p]reference of women over men in the application of public resources is just as invalid as excluding women from their benefits," relying on *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1 and *Arp* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395 [138 Cal.Rptr. 293, 563 P.2d 849]. They read the law as judging any gender classification or gender preference suspect and sustainable only on a showing of compelling state interest. But the use of gender-framed measures, supported by public resources, to remedy gender bias serves the interests of equality protected by our Constitution.[8] As the California Supreme Court observed in the course of equal protection analysis, "[s]ociety is belated in its recognition of the baseless prejudice inherent in longstanding notions of *woman's* proper social and economic roles . . . ." (*Arp, supra,* 19 Cal.3d at p. 405; italics added.)

The use of public resources for the establishment of a commission to develop and advocate measures to foster the economic and social equality of women is not a preference of women over men in the application of public resources. Its purpose is the fulfillment of constitutional principles of equality. That is the heart of plaintiffs' problem, for their view is that equality (in employment, etc.) *itself* trenches upon values they hold dear.[9]

---

[7]We note the trial court rejected both constitutional claims.

[8]A more gender-neutral title might have been selected for the commission. For example, it could have been called the Commission on the Status of Persons Historically, Socially and Economically Disadvantaged on Grounds of Gender. The gender-neutral precept of the equal protection clause does not compel such neutered diction.

[9]We do not imply that the beneficent purpose behind the establishment of the commission can wholly insulate its actions from equal protection scrutiny. However, plaintiffs do not point to any action of the commission which grants women an invidious gender-based preference. It is the very existence of a commission which advocates remedial measures which they view as an improper preference.

This position is made clear by their next argument, which they clothe in First Amendment dress.

## III

■ Plaintiffs submit that: "[i]mplicit in the statements and conduct of the Commission is the feminist ethic that woman's maximum contribution to society is her productive labor which necessarily increases her financial independence and serves as the pretext to emancipate her from unwanted child bearing, child rearing and domestic confinement." This perceived ethos[10] conflicts with plaintiffs' view that: "women's maximum contribution to society [is] the bearing and rearing of the future of the race . . . ." They ask that we "not allow the Commission to use its preferred position and funding to enhance without any defined limit its own speech to the detriment of plaintiffs' right both to speak in opposition to the Commission and their right not to enhance the Commission's speech by tax support."

This claim fails to make the critical First Amendment distinction between the "[g]overnment's [a]ddition of its [o]wn [v]oice [and the] [g]overnment's [s]ilencing of [o]thers." (See Tribe, American Constitutional Law (1978) p. 588.) ■ "That government must regulate expressive activity with an even hand if it regulates such activity at all does not mean that government must be ideologically 'neutral.'" (*Ibid.*; also see Shiffrin, *Government Speech* (1980) 27 UCLA L.Rev. 565; see generally Ziegler, *Government Speech and the Constitution: The Limits of Official Partisanship* (1980) 21 B.C. L.Rev. 578.) ■ Ordinarily, government may not compel citizens to express a view any more than it may forbid someone to express a view. (See, e.g., *West Virginia State Bd. of Edu.* v. *Barnette* (1943) 319 U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674].) ■ And, it may not delegate the authority to a nongovernmental entity to extract funds for support of political and ideological activity not directly related to the purpose for which the entity is given the power to levy. (See *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782].)

■ "But none of this means that government cannot add its own voice to the many that it must tolerate, provided it does not drown out private communication. The first amendment does not, for example, prevent gov-

---

[10]We note in passing the commission witnesses, past chair Anita Miller, appointed by then-Governor Reagan in 1972, and Pamela Faust, the staff director of the commission since 1973 hotly disputed this characterization of the commission's point of view at trial. Miller said: "I don't think the commission encouraged women to make any particular choices [as to whether they should remain in the home or go in the work force] at all. I believe that what the commission did at all times was to attempt to articulate the possibilities for women making whatever choices they wished to make for themselves." Faust concurred: "The commission has never taken a position of telling individual women what they ought to do."

ernment from promoting respect for the flag by proclaiming Flag Day or by using public property to display the flag. Those who disdain the national symbol may express that view but may not silence government's affirmation of national values, nor may they insist that government give equal circulation to their viewpoint—any more than they may insist that the flags of their choice be flown alongside the American flags that ring the Washington Monument. And if government expends public funds to subsidize flag production, the fact that some people object to this expenditure of their tax money to propagate the state's patriotic message is likely to be deemed irrelevant, either in a challenge to the expenditure itself or in a challenge to the payment of the full amount of tax." (Tribe, *supra,* at p. 590; fns. omitted.)

The root problem with plaintiffs' free speech contention is that it proves too much. They offer no point of distinction between government speech addressing the status of women and government speech on any other topic; save that they deem the topic of women's status "controversial." But, controversial or not, it is too late in the day to contend the economic and social status of women is not a legitimate topic of governmental concern.[11] If the government, i.e., the Governor and legislative leaders, cannot appoint a commission to speak on the topic without implicating plaintiffs' First Amendment rights it may not address any other "controversial" topics. If the government cannot address controversial topics it cannot govern.

"Government has legitimate interests in informing, in educating, and in persuading. If government is to secure cooperation in implementing its programs, if it is to be able to maintain a dialogue with its citizens about their needs and the extent to which government can or should meet those needs, government must be able to communicate. An approach that would invalidate all controversial government speech would seriously impair the democratic process." (Shiffrin, *supra,* 27 UCLA L.Rev. at p. 606; fn. omitted.)

The irrefutable need for government speech does not provide absolute license and in some guises government speech may have the effect of trammeling the free speech rights of others. In this regard, it is important to note what is not in issue here. This is not a circumstance in which government has established a forum for speech and is precluding some points of view from an equal opportunity to be heard.[12] (See Kalven, *The Concept of the Public Forum: Cox* v. *Louisiana,* 1965 Sup.Ct. Rev. 1; compare *Police*

---

[11]Indeed, one could say too late in the century. (See U.S. Const., 19th Amend.)

[12]We note that by statute "[a]ll meetings of the commission shall be open and public and all persons shall be permitted to attend any meetings of the commission." (§ 8243.) To the extent that portions of such meetings may provide a public forum plaintiffs tender no claim of exclusion. They admit they never sought to air their views before the commission, and never attended a commission meeting.

*Department of Chicago* v. *Mosley* (1972) 408 U.S. 92 [33 L.Ed.2d 212, 92 S.Ct. 2286], city may not permit labor picketing near school buildings and outlaw all other picketing.) To analogize the commission to such a public forum would lead to far-reaching possibilities; for example, must the federal Department of Defense permit an equal opportunity for pacifists to rebut its views *in* the myriad of statements and publications it produces? (See Shiffrin, *supra,* 27 UCLA L.Rev. at p. 572 et seq.)

Neither have plaintiffs made out a case of government speech drowning out private communication. The speech activities of the commission are in essence these: responses to inquiries; lobbying legislators; circulation of a newsletter to persons and groups that ask to receive it, and issuance of press releases on "women's issues." Granting that the commission has engaged in advocacy and promotion of its views in the course of these activities, neither the scale of that speech nor the vehicles employed appear likely to drown out plaintiffs' contrary views. That the imprimatur of government has conferred an advantage upon the commissioners is undeniable. That advantage, however, has not risen to the level of drowning out plaintiffs.

Finally, this is not a case where government speech has entered the lists in a political controversy submitted to a vote of the people. We are told that when the electorate is to exercise its franchise there is a heightened need for constitutionally based judicial oversight to avoid "poisoning the well" of majoritarian principle. (See, e.g., *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 219 [130 Cal.Rptr. 697, 551 P.2d 1].)

We perceive no reason grounded in plaintiffs' right to freedom of speech to uphold or extend the judgment's mandate of neutrality in these circumstances. Plaintiffs' generalized umbrage is aimed at the ideological content of the commission's speech and not with the concept of a commission speaking about the status of women. To the extent plaintiffs take offense from the ideas of equality of social and economic opportunity for women their remedy is amendment of the constitution, to reflect their views. To the extent they accept these ideas but desire to change the tone of the commission's speech, i.e., to emphasize how measures which may enhance the ability of women to choose to enter the work force may implicate other values, they must seek redress from the Legislature and the public officers to whom that body has granted the power to appoint members of the commission.[13]

---

[13]The commission's composition is prescribed in section 8241: "There is in the state government the Commission on the Status of Women. The commission shall consist of 17 members: three Members of the Senate and one public member appointed by the Senate Committee on Rules, three Members of the Assembly and one public member appointed by the Speaker, the Superintendent of Public Instruction, the Chief of the Division of Industrial

The judgment is reversed.

Sparks, J., concurred.

**PUGLIA, P. J.**—I concur in the judgment.

The recent enactment of Government Code section 8246 (Stats. 1982, ch. 1118, § 1) is clearly a legislative response to the trial court's judgment and was plainly intended to supersede the trial court's more narrow interpretation of the commission's authority. The judgment below prohibits the commission "from expressing to the Legislature or the public any opinion of its own on any issues of '[w]omen's educational and employment problems, needs, and opportunities.'" (Maj. opn., *ante,* p. 697.) Giving effect to newly added Government Code section 8246, I agree the judgment cannot stand.

In *Miller* v. *Miller* (1978) 87 Cal.App.3d 762 [151 Cal.Rptr. 197] (*Miller I*), we held that plaintiff's showing that the commission had spent public funds to promote the Equal Rights Amendment was adequate to defeat the commission's motion for summary judgment, because such conduct would constitute unlawful election campaigning in the absence of "clear and explicit" legislative authorization for such activity. (*Id.,* pp. 771-772.) Summary judgment was therefore reversed. After plenary trial the court made findings and rendered the judgment from which this appeal is taken. In its findings and judgment, the trial court did not expressly address the issue of expenditure of public funds for election campaigning considered by this court in *Miller I.* It did find that "some of the activities of the Commission and its members . . . have been in excess of the statutory authority and purposes for which the Commission was established" and that "such activities have involved the expenditure of public funds . . . ." The court further found, however, "that evidence as to the extent of the expenditure of public funds is insufficient upon which to base a judgment . . . ." Plaintiff's cross-appeal does not challenge the latter finding.

The decision in *Miller I* affords no basis to deny full effect to the subsequent legislative clarification of the commission's authority. Conversely,

---

Welfare in the Department of Industrial Relations, and seven public members appointed by the Governor, with the consent of the Senate. The Members of the Legislature shall serve at the pleasure of the appointing powers.

"Public member appointees of the Speaker and the Senate Committee on Rules, and appointees of the Governor shall serve four-year terms. All persons appointed pursuant to Section 2 of Chapter 1378 of the Statutes of 1965, as amended by Chapter 382 of the Statutes of 1973, shall continue in office until the expiration of their term and the appointment of their successors. The appointing powers may reappoint a member whose term has expired, and shall immediately fill any vacancy for the unexpired portion of the term in which it occurs.

"All appointees shall hold office until the appointment of their successors."

this appeal does not provide the occasion either to question or denigrate our holding in *Miller I*. The question of whether newly added Government Code section 8246 provides the commission "clear and explicit legislative authorization" to "expend public funds to promote a partisan position in an election campaign" (*Miller I, supra*, 87 Cal.App.3d at p. 764, quoting *Stanson v. Mott* (1976) 17 Cal.3d 206, 209-210 [130 Cal.Rptr. 697, 551 P.2d 1]) simply is not tendered by the record before us.

A petition for a rehearing was denied February 28, 1984.