97 Cal.Rptr.2d 501 (2000)
81 Cal.App.4th 1270
CALIFORNIANS FOR SCIENTIFIC INTEGRITY, Plaintiff and Appellant,
v.
The REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent.
No. C028522.
Court of Appeal, Third District.
July 6, 2000.
Review Denied October 3, 2000.[*]
*502 Gibson, Dunn & Crutcher, Theodore B. Olson, Los Angeles, Mark A. Perry, Thomas G. Hungar, Washington, DC, John C. Yoo, and Zumbrun & Findley, Ronald A. Zumbrun, Sacramento, John H. Findley, and Jeffrey H. Speich for Plaintiff and Appellant.
Law Office of Eric G. Scheie, for The Claremont Institute, Amicus Curiae on behalf of Plaintiff and Appellant.
Christopher M. Patti, James E. Hoist, John F. Lundberg and Eric K. Behrens, Oakland, for Defendant and Respondent.
MORRISON, J.
Plaintiff Californians for Scientific Integrity filed suit against defendant Regents of the University of California (the University), alleging the University had improperly permitted a professor to use public funds and resources to advance anti-smoking efforts. The trial court granted the University's demurrer and entered judgment in its favor.
Plaintiff appeals, reiterating that the use of public funds and resources for these purposes is impermissible and a violation of the First Amendment. We disagree and shall affirm.

STANDARD OF REVIEW
"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. `We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.... We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58; see also CAMSI TV v. Hunter Technology Corp. (1991) 230 Cal.App.3d 1525,1538-1539, 282 Cal.Rptr. 80.)

FACTS AND PROCEDURAL HISTORY
In its second amended complaint, the pleading at issue in this appeal, plaintiff identified itself as "an unincorporated association *503 composed of California residents and taxpayers. Its members include individuals who have paid federal and state taxes, the California Cigarette and Tobacco Products Surtax imposed by Proposition 99, as well as fees and grants to the University of California, all within one year prior to the commencement of this action."
The complaint also alleged that the University is responsible for administering the Tobacco-Related Disease Research Program, and that Professor Stanton A. Glantz was an employee of the University at its San Francisco campus.
In its first cause of action, entitled "Misuse of University Resources and Conversion," plaintiff asserted: "Professor Stanton A. Glantz for at least 15 years has utilized and continues to utilize University resources and the name of the University interchangeably with his private and political advocacy activities. This includes University office facilities, communication equipment and materials, and secretarial support and staff. His identities have merged. Of particular concern is his exploitation of his University identification in conjunction with his private and political activism. Professor Glantz has exploited his University affiliation on his communications as president of the Californians for Nonsmokers' Rights and Americans for Nonsmokers' Rights organizations. He solicits funds for his private and political organization using University stationery and resources. Professor Glantz' [sic] activities are political in nature and include lobbying legislative bodies and the electorate in California and other states. University has committed taxpayer money and resources to further this private political agenda."
Plaintiff specified: "Professor Glantz' [sic] activities include the following in which he uses University's name, time, staff, facilities, and resources: [¶] a. political lobbying of local legislative bodies throughout the country; [¶] b. political lobbying of the electorate throughout the country concerning local measures pending before local legislative bodies; [¶] c. political lobbying of legislative bodies and the electorate concerning measures pending before state and national legislative bodies; [¶] d. grassroots political lobbying of the electorate concerning measures pending before legislative bodies; and [¶] e. converting the University's name, time, and resources to his personal political use to further his personal political agenda."
Plaintiff alleged that the University had determined that these practices were lawful and did not violate any of the University's rules. Plaintiff stated: "It is plaintiffs position that the use of University resources to lobby the public or those elected by the public, to participate in grassroots lobbying or the encouragement of others to lobby, and the use of University resources for private political activities constitutes a violation of law. These violations include, but are not limited to, the violation of plaintiffs and the public's first amendment rights against compelled speech under the United States Constitution, state constitutional limits on University activities of political and sectarian nature, state laws prohibiting such unauthorized expenditures, constitutional law prohibiting gifts of public funds, and the laws of conversion."
A second cause of action, entitled "Violation of Code of Civ. Proc. § 526a," reiterated these contentions and sought to enjoin further expenditures.[1]
The third cause of action, denominated "First Amendment Violations," asserted *504 "Professor Glantz' [sic] use of University resources to support a smoke-free society impermissibly burdens the First Amendment constitutional rights of those who are forced to support this cause which they strongly oppose, while providing no more than an incidental benefit to education."[2]
The University demurred. As relevant to this appeal, it asserted Glantz's activities did not constitute an unauthorized use of public funds, and that state law expressly authorized the promotion of public health policies aimed at achieving a smoke-free society. The University asserted that plaintiffs second cause of action was duplicative of the first since Code of Civil Procedure section 526a did not create a cause of action but merely provided a remedy. The University also challenged plaintiffs First Amendment claim, asserting the relied-upon compelled speech cases did not apply to expenditures made by the government entity itself.
The trial court concluded the complaint failed to state a cause of action, and sustained the demurrer without leave to amend. The court subsequently entered judgment in favor of the University and this appeal followed.[3]

DISCUSSION
Plaintiff contends Professor Glantz's activities constituted an unlawful expenditure of public funds. It also asserts the University's approval of these expenditures violated its rights under the First Amendment. Neither contention has merit.

I

Unlawful Expenditure of Public Funds
We briefly review four cases defining an unlawful expenditure of public funds for partisan causes. The leading case of Stanson v. Mott (1976) 17 Cal.3d 206, 130 Cal. Rptr. 697, 551 P.2d 1 involved expenditures by the California Department of Parks and Recreation to promote the passage of a parks bond measures. (Id. at pp. 209, 210-211, 130 Cal.Rptr. 697, 551 P.2d 1.) The California Supreme Court held that "in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign[.]" (Id. at pp. 209-210, 130 Cal. Rptr. 697, 551 P.2d 1.) An agency may, however, expend funds to disseminate nonpartisan information relating to the election issues. (Id. at pp. 210, 220-221, 130 Cal.Rptr. 697, 551 P.2d 1.)
In explaining its decision, the court noted that "expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment." (Id. at p. 213, 130 Cal. Rptr. 697, 551 P.2d 1.) Reviewing cases from other jurisdictions, the court noted a "uniform judicial reluctance to sanction the use of public funds for election campaigns [resting on] an implicit recognition that such expenditures raise potential serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions." (Id. at p. 217, 130 Cal. Rptr. 697, 551 P.2d 1.)
The court contrasted improper election activity with sanctioned legislative lobbying: "[W]hile public agency `lobbying' efforts *505 undeniably involve the use of public funds to promote causes which some members of the public may not support, one of the primary functions of elected and appointed executive officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies. Since the legislative process contemplates that interested parties will attend legislative hearings to explain the potential benefits or detriments of proposed legislation, public agency lobbying, within the limits authorized by statute [citation], in no way undermines or distorts the legislative process. By contrast, the use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave to the `free election' of the people [citation] does present a serious threat to the integrity of the electoral process." (Stanson v. Malt, supra, 17 Cal.3d at p. 218, 130 Cal.Rptr. 697, 551 P.2d 1.)
In Miller v. Miller (1978) 87 Cal.App.3d 762, 151 Cal.Rptr. 197 (Miller I), this court held that the Commission on the Status of Women (Commission) violated Stanson principles by financing an appeal to voters to lobby for the ratification of the Equal Rights Amendment. (Id. at pp. 767-772, 151 Cal.Rptr. 197.) The Commission had asserted that ratification by the Legislature was not an electoral process and thus was outside the ambit of Stanson v. Mott, supra, 17 Cal.3d 206, 130 Cal. Rptr. 697, 551 P.2d 1. (Miller I, supra, at p. 767, 151 Cal.Rptr. 197.) We concluded "the real issue under Stanson is not the objective of the promotional activity but the audience to which it is directed." (Id. at p. 768, 151 Cal.Rptr. 197, italics in original.) Appropriate lobbying efforts must be limited to presentations directed to legislative bodies, not the electorate itself. (Id. at pp. 768-769, 151 Cal.Rptr. 197.) Because the Commission's activities were directed to voters and did not constitute legislative lobbying, the expenditures were improper absent clear legislative authorization for these advocacy efforts. (Id. at p. 771, 151 Cal.Rptr. 197.) We concluded such authorization did not exist. (Id. at pp. 771-772,151 Cal.Rptr. 197.)[4]
In California Common Cause v. Duffy (1987) 200 Cal.App.3d 730, 246 Cal.Rptr. 285, a county sheriff joined an effort to encourage then-Chief Justice Rose Bird to resign or, failing that, to encourage the public to vote against her retention. The sheriffs office distributed postcards with this message for voters to send directly to Chief Justice Bird. (Id, at pp. 738-739, 246 Cal.Rptr. 285.) Common Cause and taxpayers sued for declaratory and injunctive relief, asserting this activity was an illegal expenditure of public funds. (Id, at pp. 739-740, 246 Cal.Rptr. 285.) The trial court agreed and granted summary judgment. (Id. at p. 740, 246 Cal.Rptr. 285.)
In a decision reviewing the propriety of an award of attorney fees, the Court of Appeal rejected the sheriffs argument that the activity was nonpolitical and nonpartisan because it did not directly relate to an election. The court noted that the retention campaign was already underway and concluded the postcard distribution program did not serve a legitimate informational purpose but was clearly partisan political activity. (Id. at pp. 747-748, 246 Cal.Rptr. 285.)
In League of Women Voters v. Countywide Crim. Justice Coordination Com. (1988) 203 Cal.App.3d 529, 250 Cal.Rptr. 161, a county spent public funds to develop, draft, and seek a sponsor for a statewide initiative on criminal justice matters. (Id. at pp. 532-540, 250 Cal.Rptr. 161.) The appellate court concluded the development and drafting activities did not involve an attempt to persuade or influence a vote, and thus did not constitute partisan campaign activity. (Id. at p. 550, 250 Cal.Rptr. 161.) The court further held that the power *506 to draft such an initiative implied the power to seek out a proponent as well (id. at p. 554, 250 Cal.Rptr. 161), but noted that any expenditures to ensure passage of the message would run afoul of the rules set forth in Stanson v. Mott, supra, 17 Cal.3d 206, 130 Cal.Rptr. 697, 551 P.2d 1. (League of Women Voters, supra, at pp. 555-556, 250 Cal.Rptr. 161.)
With these principles in mind, we turn to the facts of the case before us. Plaintiff contends its complaint states a valid cause of action for misuse of public funds because it alleges Glantz's activities included the lobbying of both legislative bodies and the electorate on pending legislative measures. The University counters that because the complaint does not allege that any of Glantz's activities involved attempts to persuade voters in actual elections, no claim can be stated for misuse of public funds under Stanson v. Mott, supra, 17 Cal.3d 206, 130 Cal.Rptr. 697, 551 P.2d 1.
Plaintiffs complaint centers on activities associated with pending legislative measures, not measures pending before the voters. Under Stanson v. Mott, supra, 17 Cal.3d 206, 130 Cal.Rptr. 697, 551 P.2d 1, and the other cited cases, lobbying legislative bodies on such matters is permissible. However, the complaint also alleges that Glantz also encouraged the electorate to lobby legislative bodies. Under Miller I, supra, 87 Cal.App.3d 762, 151 Cal.Rptr. 197, such activity would be prohibited as it is directed toward the voters rather than the Legislature itself.
The University asserts Miller I, supra, 87 Cal.App.3d 762, 151 Cal.Rptr. 197, is no longer good law and otherwise seeks to distinguish that case. We need not consider these contentions because even if we assume for purposes of argument that Miller I is valid, that case does not prohibit activity that is clearly authorized by the Legislature. That is the situation here.
The State of California has taken an unambiguous position against smoking and tobacco-related diseases. Health and Safety Code section 104350 et seq. outlines the Tobacco Use Prevention Program, and section 104500 et seq. establishes the Cigarette and Tobacco Products Surtax Medical Research Program. (Further section references are to the Health and Safety Code unless otherwise designated.) In a statement of findings and intent, the Legislature noted "[s]moking is the single most important source of preventable disease and premature death in California," (§ 104350, subd. (a)(1)), and that "[i]nvoluntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers." (§ 104350, subd. (a)(5).) The Legislature added: "Tobacco-related disease places a tremendous financial burden upon the persons with the disease, their families, the health care delivery system, and society as a whole. California spends five billion six hundred million dollars ($5,600,000,000) a year in direct and indirect costs on smoking-related illnesses." (§ 104350, subd. (a)(7).)
The statute continues: "The State of California shall play a leading role in promoting a smoke-free society by the year 2000 and thereby supporting the National Health Status Objectives for the year 2000 relating to smoking and tobacco use." (§ 104350, subd. (a)(10).)
The Legislature declared its intent to require various departments and agencies "to cooperatively and individually conduct activities directed at the prevention of tobacco use and tobacco-related disease." (§ 104350, subd. (b).) The Legislature created the Tobacco Education and Research Oversight Committee to advise various agencies and departments, as well as the University of California, on the evaluation of funded education programs to assess their effectiveness in reducing the use of tobacco products. (§§ 104365, 104370.)
The Legislature also selected the University of California to administer the Cigarette and Tobacco Products Surtax Research Program to support research into tobacco-related disease (§ 104500, subd. *507 (b)). Specifically, the Legislature asked the University "to continue to administer a comprehensive grant program to support research efforts related to the prevention, causes, and treatment of tobacco-related-diseases." (§ 104505, italics added.) Emphasis is also placed on public policy research "that investigates and evaluates various programs and strategies used by governmental, private, and nonprofit organizations to control tobacco use." (§ 104510, subd. (e); 104515, subd. (g), italics added.)
As these statutes make clear, the State does not have neutral position on smoking and tobacco-related disease. It has concluded that first and second-hand smoke pose a significant health risk to the public and a drain on the public fisc, and it has committed itself to promoting a smoke-free society. The University is to play an integral part in achieving those goals. Advocacy on these issues, the activities challenged by plaintiff, are well within the parameters of this statutory mandate to reduce tobacco-related disease and promote a smoke-free environment.
Under these circumstances, plaintiff cannot state a cause of action for misuse of public funds.

II

First Amendment Claims
Analogizing to compelled speech cases such as Keller v. State Bar of California (1990) 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1, plaintiff contends spending public funds on Glantz's activities violates its First Amendment rights. Plaintiffs argument essentially boils down to a claim that taxpayers should not have to pay for government activities with which they do not agree. That is not the law.
As the United States Supreme Court explained, governmental entities are distinguishable from bar associations, unions and similar organizations. "Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process. If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." (Keller v. State Bar of California, supra, 496 U.S. at pp. 12-13, 110 S.Ct. at p. 2235, 110 L.Ed.2d at p. 13; see also United States v. Lee (1982) 455 U.S. 252, 260, 102 S.Ct. 1051, 71 L.Ed.2d 127, holding taxpayers may not challenge taxes spent in a manner violating their religious beliefs.)
Cases relied upon by plaintiff, such as Keller, supra, and Smith v. Regents of University of California, (1993) 4 Cal.4th 843, 16 Cal.Rptr.2d 181, 844 P.2d 500 are inapposite. The present case does not involve compelled financing of a nongovernmental organization such as a bar association or an associated students group.
As we explained in Miller II, there is a "critical First Amendment distinction between the `government's [a]ddition of its [o]wn voice [and the] [government's [silencing of [o]thers.' [Citation.] `That government must regulate expressive activity with an even hand if it regulates such activity at all does not mean that government must be ideologically "neutral."' [Citations.] Ordinarily, government may not compel citizens to express a view any more than it may forbid someone to express a view." (Miller II, supra, 151 Cal. App.3d at p. 700, 198 Cal.Rptr. 877.)
"`But none of this means that government cannot add its own voice to the many that it must tolerate, provided it does not drown out private communication. The first amendment does not, for example, prevent government from promoting respect *508 for the flag by proclaiming Flag Day or by using public property to display the flag. Those who disdain the national symbol may express that view but may not silence government's affirmation of national values, nor may they insist that government give equal circulation to their viewpointany more than they may insist that the flags of their choice be flown alongside the American flags that ring the Washington Monument. And if government expends public funds to subsidize flag production, the fact that some people object to this expenditure of their tax money to propagate the state's patriotic message is likely to be deemed irrelevant, either in a challenge to the expenditure itself or in a challenge to the payment of the full amount of tax.'" (Miller II, supra, 151 Cal.App.3d at pp. 700-701, 198 Cal.Rptr. 877.)
Plaintiff does not contend that the University prohibited expression of views contrary to Professor Glantz; it simply objects to spending public funds on a view they do not endorse. In this context, there is no violation of First Amendment rights.
Plaintiffs second amended complaint does not, and cannot, state a cause of action. The trial court therefore properly sustained the University's demurrer without leave to amend. (See CAMSI TV v. Hunter Technology Corp., supra, 230 Cal. App.3d at p. 1539, 282 Cal.Rptr. 80.)[5]

Disposition
The judgment is affirmed.
SIMS, Acting P.J., and CALLAHAN, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] Code of Civil Procedure section 526a provides in relevant part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the State, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."
[2] A fourth cause of action, for "Scientific Fraud and Negligent Supervision," is not at issue in this appeal. This claim focused on a published study by Glantz which concluded that city ordinances banning smoking in restaurants did not adversely affect restaurant sales. That study was criticized by a professor at another university. Plaintiff challenged both the use of funds to subsidize Glantz's study and the grant process of the University.
[3] The second amended complaint also listed two other defendants, the University of California, San Francisco, and the California Department of Finance. The Department of Finance was ultimately dismissed from the case. The status of University of California, San Francisco is unclear. The demurrer was filed only by the University, judgment was entered in favor of that defendant only, and this appeal involves only that defendant.
[4] The Legislature subsequently enacted legislation empowering the Commission to undertake the challenged activities. (See Miller v. California Com. on Status of Women (1984) 151 Cal.App.3d 693, 697, 198 Cal.Rptr. 877 (Miller II).)
[5] We therefore have no occasion to resolve standing concerns raised by the University.