**DISTRICT OF COLUMBIA COMMON CAUSE, et al.**

v.

**DISTRICT OF COLUMBIA, et al., Appellants.**

No. 86–7104.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1987.

Decided Sept. 20, 1988.

**2**

Edward E. Schwab, Asst. Corp. Counsel for the District of Columbia, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants.

Andrea C. Ferster, Washington, D.C., for appellees.

Before BUCKLEY and WILLIAMS, Circuit Judges, and THOMAS F. HOGAN,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

BUCKLEY, Circuit Judge:

The District of Columbia appeals from a summary judgment entered for plaintiffs by the U.S. District Court for the District of Columbia. We hold that the individual appellees have standing as municipal taxpayers to challenge expenditures by the District of Columbia government to *influence* the outcome of an initiative. On the merits, we conclude that the expenditures were illegal.

I. BACKGROUND

The plaintiffs/appellees are District of Columbia Common Cause ("Common Cause") and three individuals. Common Cause sues on its own behalf to vindicate its "direct interest in maintaining the integrity of the initiative and referendum process in the District of Columbia," Complaint at ¶ 6. It also asserts "the rights of its members who are registered voters" in the District of Columbia ("D.C." or "District"). *Id.* The three individual plaintiffs sue as voters and municipal taxpayers; two of them signed the petition to place the initiative on the ballot and voted for it. Complaint at ¶ 7. The individual plaintiffs also seek to assert the "rights of all other registered voters and taxpayers in the District of Columbia." Complaint at ¶ 7.

In November 1984, D.C. voters were asked to vote on Initiative 17, which would establish the right of all persons in the District to adequate overnight shelter and require the Mayor to take reasonable steps to provide such shelter. On election day, the District distributed pamphlets, flyers,

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

and posters urging a "No" vote on Initiative 17. D.C. spent nearly $7,000 to oppose Initiative 17, but the voters approved it.

After the dismissal of an administrative complaint, appellees instituted this action against the District and the Director of its Department of Human Services, whom they sued in his official capacity. The district court granted appellees' motion for summary judgment, holding that the use of public funds for the purpose of opposing an initiative was neither authorized by statute nor permitted by the First Amendment. The court enjoined the District from expending public funds to prepare or distribute materials supporting or opposing an initiative, referendum, or other ballot measure.

## II. DISCUSSION

### A. Standing

Although the parties did not address standing in their initial briefs, we requested supplemental briefing on that question. We conclude that the individual appellees have met the burden of establishing their standing, as municipal taxpayers, to challenge the District's use of public funds to oppose the initiative. Accordingly, we need not determine whether Common Cause has standing in its own right or as representative of its members. *See Bowen v. Kendrick,* — U.S. —, 108 S.Ct. 2562, 2580 n. 15, 101 L.Ed.2d 520 (1988) ("Because we find that the taxpayer appellees have standing, we need not consider the standing of the clergy or the American Jewish Congress.").

### 1. *Varieties of Taxpayer Standing: An Overview*

■ In the first case in which the Supreme Court explicitly considered federal taxpayer standing, *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Court reviewed previous cases in which taxpayers had been plaintiffs, including *Bradfield v. Roberts,* 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899). *Bradfield* involved an appeal from the Court of Appeals of the District of Columbia in which

that court sustained the right of the plaintiff to sue by treating the case as one directed against the District of Columbia, and therefore subject to the rule frequently stated by this Court, that resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation. *Roberts v. Bradfield,* 12 App.D.C. 453, 459–460. The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases *and is the rule of this Court. Crampton v. Zabriskie,* 101 U.S. 601, 609 [25 L.Ed. 1070] [1880].... The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation.... But the relation of a taxpayer of the United States to the Federal Government is very different. His interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

262 U.S. at 486–87, 43 S.Ct. at 600–01 (emphasis added).

The distinction between federal and municipal taxpayer standing retains its vitality. *Frothingham's* rule against federal taxpayer standing was relaxed in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968), which permitted a federal taxpayer to challenge an exercise of congressional power to tax and spend as a violation of the Establishment Clause of the First Amendment. *See also Bowen v. Kendrick,* 108 S.Ct. at 2580. The Court has never recognized federal taxpayer standing outside these narrow facts, and it

has refused to extend *Flast* to exercises of executive power (*see Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 228, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974)), or of congressional power under the Property Clause (*see Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 480, 102 S.Ct. 752, 762–63, 70 L.Ed.2d 700 (1982)). *See generally Kurtz v. Baker*, 829 F.2d 1133, 1139–40 (D.C.Cir. 1987) (surveying law of federal taxpayer standing), *cert. denied*, —— U.S. ——, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988).

*Schlesinger, Valley Forge*, and similar cases must be understood as limiting the *Flast* exception to the Court's general rule against *federal* taxpayer standing. They do not limit municipal taxpayer standing which, as we know from *Frothingham*, rests on an entirely different foundation. *See, e.g., Hawley v. City of Cleveland*, 773 F.2d 736, 741–42 (6th Cir.1985) (*Valley Forge* does not overrule recognition of municipal taxpayer standing in *Frothingham;* "Supreme Court continues to allow suits by nonfederal taxpayers to enjoin unconstitutional acts affecting public finances"), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986); *Donnelly v. Lynch*, 691 F.2d 1029, 1031 (1st Cir.1982) (no indication that *Valley Forge* intended to overrule cases establishing that municipal taxpayers have standing), *rev'd on other grounds*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

### 2. *Elements of Municipal Taxpayer Standing*

#### a. Pocketbook Injury

A taxpayer's challenge to a state expenditure establishes a case or controversy "when it is a good-faith pocketbook action." *Doremus v. Board of Education*, 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952). *Doremus* involved a challenge by state taxpayers to Bible reading in public schools. The Court recognized the distinction between municipal and federal taxpayer standing, but refused to accord standing to a state taxpayer absent evidence of "some direct injury," *id.* (quoting *Frothingham*, 262 U.S. at 488, 43 S.Ct. at 601), i.e., a "measurable appropriation" of tax funds. *Id.* (discussing *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, (1947)). As Bible reading did not involve a "direct dollars-and-cents injury," the taxpayers lacked standing. *Id.* One commentator has interpreted *Doremus* as requiring a taxpayer to challenge an activity involving an expenditure of public funds that would not otherwise be made. As the teachers in *Doremus* would be paid their salaries whether or not they read from the Bible, the challenged practice did not injure the taxpayers. *See* Note, *Taxpayers' Suits: A Survey and Summary*, 69 Yale L.J. 895, 922 (1960). *See also Bowen v. Kendrick*, 108 S.Ct. at 2580 ("The AFLA is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate.").

Although *Doremus* involved only state taxpayers, the pocketbook injury requirement also applies to municipal taxpayers, as *Doremus'* reference to *Frothingham* makes clear. For example, municipal taxpayers lack standing when they challenge a regulatory program that only incidentally involves expenditures of public funds. *See e.g., Reich v. City of Freeport*, 527 F.2d 666, 670 & n. 8 (7th Cir.1975) (challenge to police discharge procedures and other unconstitutional ordinances); *Dash v. Mitchell*, 356 F.Supp. 1292, 1298 (D.D.C.1972) (three-judge court) (D.C. taxpayers lack standing to challenge preventive detention statute; statute "serves primarily to 'regulate'"; expenditures to support administration of statute are "'incidental'"), *aff'd sub nom. Briscoe v. Kleindienst*, 409 U.S. 808, 93 S.Ct. 164, 34 L.Ed. 2d 70 (1972); *see also* Note, 69 Yale L.J. at 922. Similarly, municipal taxpayers do not have standing when no tax moneys are spent. *E.g., ACLU v. City of St. Charles*, 794 F.2d 265, 267 (7th Cir.1986) (challenge to cross erected on city property as violative of Establishment Clause; plaintiffs did

not allege that cross was funded by city revenues), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986).

■ When a municipal taxpayer can establish that the challenged activity involves a measurable appropriation or loss of revenue, the injury requirement is satisfied. *See, e.g., Hawley,* 773 F.2d at 741–42 (municipal taxpayers have standing if they can demonstrate that rental of city property for less than market value will result in loss of public revenue); *Gwinn Area Community Schools v. Michigan,* 741 F.2d 840, 844 (6th Cir.1984) (local taxpayer has standing to challenge state educational aid formula that reduces remittances to local school districts); *Schreiber v. Lugar,* 518 F.2d 1099, 1101 n. 2 (7th Cir.1975) (municipal taxpayer has standing to challenge city's expenditures to construct sports arena); *Annunziato v. New Haven Bd. of Aldermen,* 555 F.Supp. 427, 431 (D.Conn.1982) (municipal taxpayers have standing to challenge transfer, for one dollar, of city property worth $30,000).

### b. Causation and Redressability

■ Injury is only the first part of the standing analysis; the plaintiff must also establish that the challenged action caused the injury and that the injury would be redressed by a favorable decision. *See, e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (generally discussing elements of standing). When the relief requested does not go beyond an order that the allegedly illegal conduct cease, causation and redressability are essentially identical requirements. *See id.* at 753 n. 19, 104 S.Ct. at 3325 n. 19; *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988). For brevity's sake, we will speak only of redressability.

In *Valley Forge,* the Court questioned whether invalidating a transfer of surplus property would have reduced the plaintiffs' tax burden. As there was "no basis for believing that a transfer to a different purchaser would have added to Government receipts," and delay in disposition of the property entailed upkeep costs, the claimed injury—a heavier tax burden—would not be redressed by the relief requested. 454 U.S. at 480–81 n. 17, 102 S.Ct. at 762–63 n. 17.

■ We can only apply the redressability requirement after carefully defining the injury. *Frothingham* described the municipal taxpayer's injury as the "misuse" of municipal funds. 262 U.S. at 486, 43 S.Ct. at 600. The Court analogized the municipal taxpayer to the corporate shareholder, who has the right to sue to enjoin *ultra vires* acts by the corporation. The taxpayer's injury is not the *payment* of taxes, for which the only cure would be a rebate or reduction in taxes. Just as the shareholder need not prove that the funds he claims the Board of Directors has misapplied will be returned to him as a dividend, so the taxpayer need not show that the specific taxes he paid were used unlawfully, nor that his taxes will be reduced as a result of the judgment. By enjoining an illegal expenditure, the court can redress the taxpayer's injury caused by the misuse of public funds and ensure that the funds will be devoted to lawful purposes of possible benefit to the taxpayers.

■ The Supreme Court has never required state or municipal taxpayers to demonstrate that their taxes will be reduced as a result of a favorable judgment. If a state taxpayer has shown that the challenged program involves a measurable appropriation of public funds, the Court will recognize standing. The injury—misuse of public funds—is redressed by an order prohibiting the expenditure. *See, e.g., Grand Rapids School District v. Ball,* 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 3220 n. 5, 87 L.Ed.2d 267 (1985), and cases cited; *Chambers v. Marsh,* 675 F.2d 228, 230 (8th Cir. 1982) (taxpayer has standing to challenge payment of $320 per month out of general tax revenues to legislative chaplain), *aff'd in relevant part,* 463 U.S. 783, 786 n. 4, 103 S.Ct. 3330, 3333 n. 4, 77 L.Ed.2d 1019 (1983). We do not think the standard is different for municipal taxpayers. *See, e.g., Hawley,* 773 F.2d at 741; *Gwinn,* 741 F.2d at 844; *Schreiber,* 518 F.2d at 1101 n. 2; *see also* Note, 69 Yale L.J. at 903.

### c. Nexus Not Required

■ Federal taxpayers must allege not only a nexus between their status as taxpayers and the government action challenged (i.e., an exercise of congressional power under the taxing and spending clause of Art. I, section 8 of the Constitution), but also a nexus between the taxpayer injury and the constitutional claim (i.e., that the action exceeds a specific limitation on that clause). *Flast*, 392 U.S. at 102–03, 88 S.Ct. at 1953–54. The first nexus was met in *Flast* because the plaintiffs challenged a massive spending program. The second nexus was met because the plaintiffs argued that the expenditures violated the Establishment Clause, which the Court concluded acted as a specific limitation on Congress' taxing and spending power. *Id.* at 103, 88 S.Ct. at 1954. (Two concurring Justices thought that a federal taxpayer could only raise a challenge under the Establishment Clause. *Id.* at 114, 88 S.Ct. at 1959–60 (Stewart, J., concurring); *id.* at 115, 88 S.Ct. at 1960 (Fortas, J., concurring)).

As municipal and federal taxpayer standing are based on different doctrinal underpinnings, the second nexus requirement does not apply to municipal taxpayers. *Frothingham*'s bar on federal taxpayer standing derived from concerns both about the attenuation of the federal taxpayer's interest in federal expenditures and about the flood of litigation that would otherwise result. *Flast* seems to have rejected the former rationale, recognizing, as we have previously stated, that a federal taxpayer's interest in spending programs "is conceptually direct, even though the dollar-and-cents consequence for a taxpayer is minimal." *Public Citizen, Inc. v. Simon*, 539 F.2d 211, 218 (D.C.Cir.1976). *Flast* nevertheless limited federal taxpayer challenges by means of the second nexus, thereby ensuring an appropriately modest role for federal courts in our system of separated powers. *See Moore v. United States House of Representatives*, 733 F.2d 946, 959 n. 1 (D.C. Cir.1984) (Scalia, J., concurring), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985).

The separation of powers consideration is not applicable in the context of municipal taxpayer standing. Whereas federal taxpayers must demonstrate that Congress had no constitutional power to authorize the expenditure, a federal court has no interest in determining whether the expenditure violates the authority of the municipal legislature. We are concerned only with the congruence between the Constitution and the municipal action, be it "legislative" or "executive." *Public Citizen*, 539 F.2d at 218 n. 30 ("state taxpayers may be able to challenge executive conduct, as was the case in *Everson*, while federal taxpayers ... are restricted to Congressional exercises of the taxing and spending power").

■ Some have argued that federalism may replace separation of powers as a limiting principle in cases involving *state* taxpayers. *See, e.g., Taub v. Kentucky*, 842 F.2d 912, 917, 918 (6th Cir.1988) (state taxpayer standing governed by *Frothingham*'s rule against federal taxpayer standing, except when plaintiffs allege violation of Establishment Clause), *petition for cert. filed*, 57 U.S.L.W. 3007 (U.S. June 23, 1988) (No. 87–2094); *Hoohuli v. Ariyoshi*, 741 F.2d 1169, 1183 (9th Cir.1984) (Wallace, J., dissenting in part) (federalism should limit state taxpayer standing).

Whatever the merits of that view, it does not apply to the District of Columbia, which is "constitutionally distinct from the States." *Palmore v. United States*, 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed. 2d 342 (1973); *see also National Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 588, 69 S.Ct. 1173, 1176, 93 L.Ed. 1556 (1949) plurality opinion). We therefore have recognized that "the District, unlike the states, has no reserved power to be guaranteed by the Tenth Amendment." *Lee v. Flintkote Co.*, 593 F.2d 1275, 1278 n. 14 (D.C.Cir.1979). Given the District's unique status, it would be inappropriate to impose a constitutionally based federalism restriction on D.C. taxpayer standing:

> [T]hose limitations implicit in the rubric "case or controversy" that spring from the Framers' anxiety not to intrude unduly upon the general jurisdiction of

state courts need have no application in the District.

*Glidden Co. v. Zdanok,* 370 U.S. 530, 581, 82 S.Ct. 1459, 1489, 8 L.Ed.2d 671 (1962) (plurality opinion) (citation omitted).

While we are reluctant to intrude on the autonomy granted *by Congress* to the District of Columbia and its own judiciary under the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 552 (*cf.* below at 17), this deference is unrelated to the constitutional principle of federalism, which finds its roots in the powers and independent role reserved to the sovereign states by the Constitution. Rather, we have extended deference "because the Court Reform Act made the District of Columbia Court of Appeals the 'highest court' of the District, and thus the principal arbiter of District law." *Flintkote,* 593 F.2d at 1278 n. 14.

We note that most courts have refused to apply *Flast*'s second nexus to municipal taxpayer standing:

> The distinction between taxpayer standing to challenge municipal but not federal spending was explicitly made in *Frothingham v. Mellon,* 262 U.S. 447, 486–87 [43 S.Ct. 597, 600–01, 67 L.Ed. 1078] (1923), and the extension of taxpayer standing to challenge federal expenditures alleged to violate the Establishment of Religion Clause, *Flast v. Cohen,* 392 U.S. 83 [88 S.Ct. 1942, 20 L.Ed.2d 947] (1968), should not be considered a retrenchment of taxpayer standing to challenge municipal expenditures.

*Ridgefeld Women's Political Caucus, Inc. v. Fossi,* 458 F.Supp. 117, 120 n. 3 (D.Conn. 1978) (taxpayer challenge to town's donation of valuable property to club that discriminated on basis of sex is a good-faith pocketbook action). *See also Taub,* 842 F.2d at 917 (municipal taxpayer standing recognized in a variety of cases not involving Establishment Clause challenges); *Gwinn,* 741 F.2d at 844 (equal protection and due process); *Schreiber,* 518 F.2d at 1101 n. 2 (equal protection); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure: Jurisdiction 2d* § 3531.10, at 653 (1984). *But see Frissell v. Rizzo,* 597

F.2d 840, 850 (3d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979).

### 3. *Relevance of* Miller

Appellants argue that appellees' claim of municipal taxpayer standing is foreclosed by *Miller v. California Commission on the Status of Women,* 469 U.S. 806, 105 S.Ct. 64, 83 L.Ed.2d 15 (1984) (*"Miller–U. S."*). Supplemental Brief for Appellants at 7–8. *Miller–U.S.* was an appeal from a California court's judgment for the defendant in a state taxpayers' challenge to the political activities of a state commission. *Miller v. California Commission on the Status of Women,* 151 Cal.App.3d 693, 198 Cal.Rptr. 877 (3 Dist.1984) (*"Miller–Cal."*). The Supreme Court dismissed the appeal "for want of jurisdiction. *Doremus v. Board of Education,* 342 U.S. 429 [72 S.Ct. 394, 96 L.Ed. 475] (1952)."

The Court first discussed the precedential weight of summary dispositions in *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). *Hicks* was an appeal from a judgment of a three-judge court holding unconstitutional a state obscenity statute. Although the Supreme Court had summarily dismissed, for want of a substantial federal question, an appeal from a ruling of a state court upholding the same statute against the same constitutional attack, the lower federal court concluded it was not bound by the Court's summary dismissal. The Supreme Court reversed. Lower courts "are bound by summary decisions by this Court." 422 U.S. at 344–45, 95 S.Ct. at 2289–90. The Court noted, however, that the summary dismissal is controlling precedent only if the issues in the two cases are sufficiently similar. *Id.* at 345 n. 14, 95 S.Ct. at 2290 n. 14.

*Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), emphasized the limited weight to be accorded summary dispositions. As the rationale for summary action is unclear, such dispositions are to be narrowly construed. " 'An unexplicated summary affirmance ... is not to be read as a renunciation by this Court of doctrines previously announced in

our opinions after full argument.'" 432 U.S. at 176, 97 S.Ct. at 2240 (quoting *Fusari v. Steinberg*, 419 U.S. 379, 391–92, 95 S.Ct. 533, 541, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring)). Similarly: "Summary actions ... should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Id.*

To identify the issue or issues in *Miller–U.S.* that caused the Supreme Court to dismiss the appeal, we first look to *Doremus*, on which the dismissal was predicated. This is an easy task because *Doremus* contained just one issue of possible relevance to *Miller–U.S.*: whether the taxpayer appellants had standing to challenge the constitutionality of a New Jersey statute requiring daily readings from the Old Testament in its public schools. The Court noted that a "taxpayer's action can meet [the 'case or controversy'] test ... only when it is a good-faith pocketbook action." 342 U.S. at 434, 72 S.Ct. at 397. As appellants' complaint had failed to show "a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of," *id.*, the Court dismissed their appeal for want of jurisdiction.

When we turn to *Miller–Cal.*, we find that the record presented no clear evidence that the challenged activities had been financed at public expense. As the concurring judge pointed out:

> the trial court did not expressly address the issue of expenditure of public funds for election campaigning considered by this Court in Miller I.... The [trial] court ... found ... "that evidence as to the extent of the expenditure of public funds is insufficient upon which to base a judgment...." Plaintiff's cross-appeal does not challenge the latter finding.

198 Cal.Rptr. at 884 (Puglia, J., concurring) (citations omitted).

Thus the Supreme Court's summary dismissal of the appeal in *Miller–U.S.* "for want of jurisdiction" represents a straightforward application of the *Doremus* rule that a state taxpayer will not have standing to bring a suit unless he can show pocketbook injury. As the taxpayers in this case have made such a showing, appellants' argument that their claim is foreclosed by *Miller–U.S.* is without merit. To read *Miller–U.S.* more broadly would contravene the Supreme Court's direction not to read summary dispositions as renouncing doctrine established in previous cases (here by *Frothingham* ).

### 4. Application to Present Case

Unlike *Miller*, the record here clearly demonstrates that appellees are challenging a specific expenditure of public funds. Indeed, the relief granted was an injunction against the use of public funds by the District to campaign against initiatives. *District of Columbia Common Cause v. District of Columbia*, No. 85–3528, slip op. at 9 (D.D.C. Oct. 21, 1986). Appellees did not seek to restrict the speech of individual government officials, which would have raised standing questions similar to those posed in *Doremus*. *See* Complaint at ¶ 13.

This case differs from the typical taxpayer suit because appellees do not seek to enjoin ongoing expenditures. Nor did appellees ask the individual defendants to reimburse the public treasury for the $7,000 spent in connection with the 1984 campaign. Although they sought restoration of "all funds that were unlawfully expended" by the District and its Director of Human Services, as well as an injunction against future such expenditures, *id.*, they obtained only the latter. Appellees have not pursued their request for restoration of moneys on appeal, possibly because they concluded, on reflection, that the request that the District and its Department reimburse themselves would not redress the injury caused by past misuse of public funds. Thus we examine redressability solely in the context of appellees' request for an injunction against future activity.

In order to obtain such an injunction, a plaintiff cannot simply allege that he was previously subjected to the defendant's actions. Although past harm is relevant, the ultimate standing inquiry remains "whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414

U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). *See also City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1666–67, 75 L.Ed.2d 675 (1983) (standing to seek injunction depends on whether plaintiff "likely to suffer future injury"); *Haase v. Sessions,* 835 F.2d 902, 911 (D.C. Cir. 1987) (discussing future injury requirement for standing to seek injunctive and declaratory relief).

*O'Shea* and *Lyons* differ from this case because they involved individual plaintiffs who had been subjected to challenged governmental practices. Their standing depended on proof that they, and not some other members of the public, would be subjected to the practices again. Here, by contrast, appellees will be injured as taxpayers if the District again uses public funds to play a partisan role in an initiative campaign.

Appellees have satisfied their burden by alleging that the District is likely to use public funds to campaign against a future initiative and therefore to injure their interests as municipal taxpayers. The complaint states that seventeen initiatives and one referendum have been voted upon in the District since 1978, and there is cause to think the practice will continue. The complaint continues:

> Initiatives and referenda, by their nature, often involve controversial subjects which have garnered little support from governmental authorities and legislators. Plaintiffs, therefore, have reason to believe that defendants will continue to make unlawful expenditures in opposition to initiative or referendum measures ..., thereby continuing to cause injury....

Complaint at ¶ 22. As this claim is not logically defective, we cannot dismiss the complaint unless the allegation lacks factual support. *See Haase,* 835 F.2d at 907.

Although the factual record on this allegation is sparse, we think appellees have made a sufficient showing to avoid dismissal for lack of standing. The District spent $7,000 in the 1984 campaign, which is evidence that it may do so again. *O'Shea,* 414 U.S. at 496, 94 S.Ct. at 676. Moreover, counsel for the District did not merely defend the expenditures as legal. Rather, he insisted that they are necessary to fulfill the government's "obligation" to inform the electorate of its views on an initiative. Brief for Appellants at 6, 7. Absent unusual circumstances not present here, representations of counsel are attributable to the client. *See Link v. Wabash R.R. Co.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390–91, 8 L.Ed.2d 734 (1962); *Frank v. Bloom,* 634 F.2d 1245, 1251 (10th Cir.1980). The District's claim that the challenged conduct is a vital function of government provides sufficient support for appellees' allegation that appellants are likely to repeat their 1984 campaign activities.

The factual support for appellees' allegations might have been inadequate had the District challenged them by a motion for summary judgment for want of standing. *See Haase,* 835 F.2d at 907. Absent such a challenge, however, we are satisfied that the modest factual record is sufficient to withstand dismissal. *See id.* (court may inquire, sua sponte, into factual basis for standing allegations).

Appellees' injury—the District's future misuse of public funds—will be redressed by an injunction prohibiting such expenditures. Even though the injunction is unlikely to reduce appellees' tax payments, it will ensure that their taxes are not used unlawfully in the future to advance political objectives they may oppose, but only for lawful purposes of potential benefit to them as taxpayers.

### B. Pendent Jurisdiction

Appellees argue that the District's expenditures violated both the First Amendment and D.C. law. The claim under D.C. law is: (1) a taxpayer has standing to seek an injunction to prevent D.C. from expending sums not authorized by statute; (2) a D.C. statute provides that no expenditure may be made unless it is authorized by Congress; (3) Congress did not authorize D.C. to use funds for political campaigning. This claim is examined more fully below.

We have no independent jurisdiction over a claim under D.C. law that does not "arise under" federal law. 28 U.S.C.A. § 1366 (West 1986); *Dimond v. District of Columbia,* 792 F.2d 179, 188 (D.C.Cir.1986). The fact that the D.C. statute "incorporates" federal law does not make the claim one "arising under" federal law. *See Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed. 2d 650 (1986). As the parties do not claim that the statutory cause of action arises under federal law, we may reach it only if it is considered "pendent" to a federal claim.

■ The leading case on pendent jurisdiction is *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Supreme Court established a two-part test: (1) did the trial court have *power* to hear the pendent claim, and (2) should the court have exercised its *discretion* to hear the pendent claim. The first part of the test is satisfied when a non-frivolous claim arising under federal law and one arising under state law are elements of a single "case," i.e., "derive from a common nucleus of operative fact." 383 U.S. at 725, 86 S.Ct. at 1138. Under the second part of the test, the district court must consider a variety of factors, including judicial economy, convenience and fairness to litigants, avoidance of needless decisions of state law (in order to promote comity and obtain a "surer-footed reading of applicable law"), the timing of the dismissal of the federal claims, the predominance of state versus federal issues, and the potential for jury confusion. *Id.* at 726–27, 86 S.Ct. at 1138–39.

The district court in this case held for appellees on the constitutional as well as the pendent claim. The court had power to exercise jurisdiction over the pendent issue, as the two claims manifestly derive from a common nucleus of operative fact. Although we do not decide the constitutional issue, we recognize that it is not " 'so attenuated and unsubstantial as to be absolutely devoid of merit.' " *Hagans v. Lavine,* 415 U.S. 528, 536, 94 S.Ct. 1372, 1378, 39 L.Ed.2d 577 (1974) (quoting *Newbury-*

*port Water Co. v. Newburyport,* 193 U.S. 561, 579, 24 S.Ct. 553, 557, 48 L.Ed. 795 (1904)). The constitutional claim suffices to establish federal jurisdiction, and the court had power to hear the pendent claim.

■ Furthermore, the district court did not abuse its discretion in exercising pendent jurisdiction. As the district court was prepared to hear the federal claim, judicial economy and convenience argue most strongly for reaching the pendent claim as well. There may be cases in which the local law issue is so important and so unsettled that the district court must decline to exercise pendent jurisdiction even though it decides the federal claim for the plaintiff. *Cf. Grano v. Berry,* 733 F.2d 164, 169 (D.C.Cir.1984); *United States ex rel. Small Bus. Admin. v. Pena,* 731 F.2d 8, 15 (D.C.Cir.1984) ("even when *Gibbs* has no application, pendent jurisdiction should sometimes be declined when local law issues are unsettled, complex, or novel"); *Doe v. Board on Professional Responsibility,* 717 F.2d 1424 (D.C.Cir.1983). This is not such a case. As we discuss below, the pendent claim does not entail the interpretation of an ambiguous D.C. statute but merely the application of a clear statutory prohibition in a *congressional* appropriations statute. *Cf. Dimond,* 792 F.2d at 189 (court reverses on federal issue and affirms on pendent ground not reached by court below because local law clear).

C.  Merits

■ The right of a taxpayer under District of Columbia law to sue to enjoin an unlawful expenditure of public funds has long been recognized. *Roberts v. Bradfield,* 12 App.D.C. 453, 459–60 (1898), *aff'd,* 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899). *See also Frothingham,* 262 U.S. at 487, 43 S.Ct. at 601 (discussing *Bradfield* ); *Calvin–Humphrey v. District of Columbia,* 340 A.2d 795, 799 (D.C.1975) ("taxpayers have always had the right, in the proper case, to initiate suit against the city government to prevent illegal use of municipal funds").

District of Columbia law provides:

Except as provided in [sections dealing with public indentures], no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by act of Congress, and then only according to such act.

D.C.Code Ann. § 47–304 (1987). The expenditures involved in this case were made from funds appropriated by Congress.

The funds were expended in November 1984, i.e., fiscal year 1985. The congressional appropriations statute for that fiscal year provides: "No part of this appropriation shall be used for publicity or propaganda purposes or implementation of any policy including boycott designed to support or defeat legislation pending before Congress or any State legislature." H.R. 5899, 98th Cong., 2d Sess. § 117 (1984), *adopted in* Pub.L. No. 98–473, 98 Stat. 1837 § 101(b) (appropriating sums as provided in H.R. 5899). The statute prohibits D.C. from using federally appropriated funds for (1) publicity, (2) propaganda, and (3) policies to influence legislation. Printing pamphlets, flyers, and posters in connection with an initiative campaign constitutes publicity or propaganda within the meaning of the appropriations statute. The expenditures are prohibited on the first two grounds specified, and we need not decide whether the D.C. electorate voting on an initiative is a "State legislature" under the statute.

As we conclude that appellees must prevail on the pendent claim, we decline to address their argument that the expenditures violate the First Amendment. The judgment of the district court with respect to the pendent claim is

AFFIRMED.

STEPHEN F. WILLIAMS, Circuit Judge, concurring:

Municipal taxpayer standing appears on its face inconsistent with current principles of constitutional standing. The Supreme Court, however, has found standing for municipal taxpayers (though seemingly not since *Bradfield v. Roberts,* 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899)), and has more recently endorsed it in dictum, *Frothingham v. Mellon,* 262 U.S. 447, 486, 43 S.Ct. 597, 600, 67 L.Ed. 1078 (1923). I do not dissent from my colleagues' view that it is not for us to overturn the doctrine, see *Olson v. Paine, Webber, Jackson & Curtis, Inc.,* 806 F.2d 731, 741–42 (7th Cir.1986) (reviewing reasons why a circuit court should follow even heavily battered Supreme Court authority), but write separately to highlight the incongruity between the doctrine and modern standing principles.

Any injury to plaintiffs as taxpayers here is highly fictional. A District of Columbia taxpayer with an income of $1 million a year would have contributed about 27 cents to the challenged expenditures of $7000.[1] If our hypothetical Croesus could actually recover these 27 misspent cents, or if the real taxpayers here could recover their (presumably) smaller portions, the injury would amount to "an identifiable trifle," *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973), caused by the allegedly illegal act and redressable by the court. This would satisfy the minimum requirements for constitutional standing. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In the real world of municipal finance, however, taxpayers cannot recover misspent funds; they can allege no more than that correction of the illegality might lead to alternative lawful expenditures redounding to their benefit.

One can imagine a case where a taxpayer could show a "substantial likelihood" that the illegal spending caused him to suffer an identifiable loss, redressable at the

---

**1.** During the relevant period D.C. residents were assessed personal income taxes of $1950 on the first $25,000 of taxable income, plus 11% of the excess, 47 D.C.Code Ann. § 1806.3(a) (1981), resulting in a tax burden of about $109,200 for

my hypothetical taxpayer. D.C. general expenditures for the year ending June 30, 1985 were $2.835 billion. Statistical Abstract of the United States 277 (1988). $109,200/2,835,000,000 × $7000 = 27 cents.

hands of the courts. See *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 75, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978). For example, taxpayers might prove that a municipal council had originally earmarked funds for a civic project of benefit to them, and had then amended the budget to shift the funds to an illegal purpose. But here, as is conventional in municipal taxpayer suits, the taxpayers make no effort to "identify" a trifling loss (it is hard to see how a loss can be an "identifiable" trifle until it is identified), much less to establish any causal link between it and the illegality. Thus municipal taxpayer standing represents an exception to current standing requirements.

Moreover, the evolution of standing doctrine has significantly undermined the original case for municipal taxpayer standing, however strong one may perceive that case. In *Frothingham v. Mellon*, the Court distinguished the municipal from the federal taxpayer on the ground that whereas the former's interest in the lawful application of funds was "direct and immediate," that of the latter "is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." 262 U.S. at 486–87, 43 S.Ct. at 600–01. In practice the Court's deprecatory observations about federal taxpayer standing seem equally applicable to municipal taxpayer suits that, like the present one, involve large municipalities and modest sums. Perhaps one might defend the rule as a rough and ready line between cases where the taxpayer interest is realistically significant and ones where it is not, as courts cannot readily draw numerical lines. But the current criteria for injury and causation, requiring a showing of a substantial likelihood that the illegal act caused the plaintiff an identifiable loss, now provide a substitute for the rough standard effected by allowing suit by municipal taxpayers (and rejecting suit by federal ones).

In *Frothingham* the Court also invoked an analogy to corporate shareholders' derivative actions to support municipal taxpayer standing. See *id.* at 487, 43 S.Ct. at 601. The analogy is not fully satisfying. A corporate shareholder holds a specific proportional interest in the corporation, usually marketable at a price reflecting the market's understanding of the firm's assets and prospects. That price should benefit from the corporation's recovery (or expected recovery) of funds in the derivative action. A municipal taxpayer, by contrast, has a less direct interest in the municipal treasury, as he depends for benefits on the outcome of the political and administrative process.

As I understand the court's opinion, we agree that affording *state* taxpayers standing on so exiguous a basis would at least raise a very serious problem of federalism: it would allow the federal courts to set aside state action despite the absence of a concrete, palpable injury. See Maj. Op at 6, citing *Taub v. Kentucky*, 842 F.2d 912 (6th Cir.1988) (seeming to reject state taxpayer standing outside of Establishment Clause claims, but accepting municipal taxpayer standing), *petition for cert. filed*, 57 U.S.L.W. 3007 (U.S. June 23, 1988) (No. 87–2094); *Hoohuli v. Ariyoshi*, 741 F.2d 1169, 1183 (9th Cir.1984) (Wallace, J., dissenting in part) (views standing for state taxpayers as improper absent proof of logical connection between the alleged illegality and "an increase in [plaintiffs'] own tax liability"). In the case of a taxpayer of any *municipality* other than the District of Columbia, at least some of the same concern remains. To be sure, states are the entities explicitly protected by federalism. But as municipalities are simply units of government on which states have devolved a portion of their authority, judicial intrusion on municipal officials (without a real injury) seems as troubling as intrusion on state ones. This is especially so if one recognizes federalism itself as manifesting a concern for local decisionmaking. But see *Taub v. Kentucky*, supra (distinguishing between state and municipal taxpayers); see also *Lincoln County v. Luning*, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766

(1890) (denying municipal corporations the protection of the 11th Amendment).

Here, of course, no *constitutional* federalism can be relevant (i.e., provide a special necessity for judicial insistence on a real injury), as the Constitution expressly grants Congress plenary legislative power over the District. Art. I, § 8, cl. 17. As the court notes, however, Congress has granted the District considerable authority to govern its own affairs and, in particular, to adjudicate its own legal disputes. See District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 552 (1970); District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), codified as amended at scattered sections of District of Columbia Code (1981). Thus, as the court suggests, Maj.Op. at 6–7, Congress's authority over the District may justify a relaxation of constitutional standing requirements. But even if this be so, prudential standing limitations may nonetheless come into play. The Supreme Court has observed that in the absence of such limits "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Congressional action can override prudential limits, see *id.* at 500–01, 95 S.Ct. at 2205–07, and perhaps if Congress had retained full authority over the District, one might read that retention as confirming the irrelevance of the federalism precepts that seem to require denying standing to state taxpayers who cannot show a direct injury. By the same token, the congressional effort to give the District much of the autonomy of states seems to support a prudential rule under which District taxpayers would have no more standing than municipal taxpayers elsewhere, perhaps no more than state taxpayers.[2]

In *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Supreme Court complicated the situation by relaxing the former absolute barrier to *federal* taxpayer standing and substituting a test that requires two types of "nexus" between the taxpayers' injury and the claim asserted. The second of these nexi is a showing "that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the ... taxing and spending power." *Id.* at 102–03, 88 S.Ct. at 1953–54. There the plaintiff claimed that certain federal expenditures violated the Establishment Clause, which the Court readily found to be a specific limit of the sort required. History supported this view. The colonists felt an understandable moral outrage that a citizen should be forced to pony up money to subsidize religions that he might abominate. The Court quoted Madison: "[T]he same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever." 392 U.S. at 103, 88 S.Ct. at 1954. Madison's point is in part, of course, a familiar slippery-slope argument; more broadly, it attacks even trivial exactions of this type.

While *Flast* may simply open a new door for federal taxpayers, an alternative reading is that it makes a more general, conceptual shift in the analysis of taxpayer standing at all levels of government. The municipal/federal line of course can still serve as a rough cut at some quantitative difference for taxpayers; *Flast* does not directly impinge on its validity as such. On the other hand, *Flast* tends to move the analysis to the plaintiff's genuine interest—in *Flast* itself, the taxpayers' interest in her funds not being used for the "establishment" of religion. The present plaintiffs cannot assert an equivalent interest: at

<hr/>

**2.** Viewing the District as an arm of Congress, one might suppose that separation of powers principles, which underlie the requirement of a real injury where congressional action is attacked, would impose a similar requirement here. But as it is the conduct of locally elected officials that is under attack, it is the quasi-federalism manifest in the congressional grant of District autonomy that requires us to insist on a sufficient injury.

least they have not even suggested that the First Amendment's free speech clause limits the taxing and spending power as clearly as the Establishment Clause.

The post-*Flast* cases in the lower federal courts relying on municipal taxpayer standing shed some light on whether such standing serves a useful function. We may put aside cases that can be sustained simply as applications of *Flast* at the local level, such as *Donnelly v. Lynch*, 691 F.2d 1029 (1st Cir.1982), rev'd on other grounds, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *Fausto v. Diamond*, 589 F.Supp. 451 (D.R. I.1984); such cases obviously do not depend on a generalized (nexi-free) taxpayer standing.

Apart from them, what is there? In two Establishment Clause cases, the courts found standing for municipal taxpayers challenging municipal dispositions of property rather than "spending." *Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir. 1985); *Annunziato v. New Haven Bd. of Aldermen*, 555 F.Supp. 427 (D.Conn.1982). These cannot be sustained under the *Flast* doctrine as it has evolved: *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), limited *Flast* to spending, and refused to apply it to a federal disposition of property pursuant to Congress's power under the Property Clause of Article IV. While it is far from clear why a taxpayer alleging injury because of his government's failure to realize full value on disposition of government property should not be as able to complain as a taxpayer alleging injury from the spending of cash, the distinction seems no less applicable to the municipal taxpayer than to the federal one. Under *Hawley* and *Annunziato*, however, a municipal government is more exposed to Establishment Clause challenges than the federal government, even though in literal terms the First Amendment applies only to the latter.

Finally, there are four instances where courts have relied on state or municipal taxpayer standing to address alleged *inequalities* in the distribution of government resources: *Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir.1984) (allocation of state resources exclusively for benefit of native Hawaiians); *Gwinn Area Community Schools v. Michigan*, 741 F.2d 840 (6th Cir.1984) (state education funds allocated to local school districts are decreased where district receives federal impact funds); *Ridgefield Women's Political Caucus v. Fossi*, 458 F.Supp. 117 (D.Conn. 1978) (town supplied land at nominal fee to Boys' Club for recreational purposes; court finds that town has thereby discriminated against girls in the provision of recreational opportunities, which discrimination it may cure by equalizing that provision); *Northwestern School District v. Pittenger*, 397 F.Supp. 975 (W.D.Penn.1975) (state alleged to violate equal protection and due process clauses of 14th Amendment in special allocation of state education funds to districts of low population density). In each of these cases persons who were denied governmental benefits as a result of the discrimination were surely more appropriate plaintiffs than simple taxpayers as such.

In short, the record of the last 20 years suggests that the sole effect of non-federal taxpayer standing in the federal courts has been to allow such taxpayers (1) to present the sort of Establishment Clause claims that *Valley Forge* denies federal taxpayers, i.e., ones not involving an explicit *spending* of funds, and (2) to present discrimination claims that could far more plausibly be brought by genuine victims of discrimination. And, of course, in this case, through the operation of pendant jurisdiction, see *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), it gives taxpayers access to a federal court for a claim under District law.

Accordingly it would seem that abolition of municipal taxpayer standing as a special doctrine would eliminate a serious risk of unjustified intrusions on local independence, leaving courts quite able to grant relief for taxpayers who suffer a palpable injury, linked to the alleged illegality by the sort of causal connection normally required for constitutional standing.

In our particular case, it would appear that whatever the merits of the claim, the class of persons with the conceptually best standing would be persons who had actively spoken out in support of the initiative that the defendant District government opposed. These could claim that the District's expenditures (regardless of their source) had harmed them by drowning out their own messages. In fact, however, the individual plaintiffs here claim involvement (outside their taxpayer role) only to the extent of having signed the initiative petition or voted for the initiative. There is no apparent reason to suppose that their primary (non-taxpayer) interest here is any other than Common Cause's: a generalized interest in a purified voting process. With my colleagues, of course, I do not reach the issue of whether that interest is enough for standing. Because of the Supreme Court's unabandoned doctrine of municipal taxpayer standing, however, I concur.