*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 19-CV-1100 & 19-CV-1221

DYLAN CARRAGHER, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE,

Appeals from the Superior Court
of the District of Columbia
(CAB-6109-19)

(Hon. John M. Campbell, Trial Judge)

(Decided October 22, 2020)

Before GLICKMAN, BECKWITH, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Dylan Carragher sued the District of Columbia challenging the validity of the Sports Wagering Procurement Practices Reform Exemption Act of 2019 ("Exemption Act"). D.C. Law 23-1, 66 D.C. Reg. 2451. This Exemption Act permitted the Office of Lottery and Gaming to award a non-competitive contract for operating the District's sports gambling system unencumbered by preexisting procurement laws, which otherwise would have required a competitive bidding process for awarding the contract. D.C. Code § 2-

351.01, *et seq.* (2016 Repl.). Mr. Carragher argues the Exemption Act effectively amended Title IV of the Home Rule Act—also known as the District's Charter—which is something the D.C. Council is not empowered to do without ratification via a public referendum process that did not occur here. D.C. Code § 1-203.03(a); *see also Zukerberg v. District of Columbia Bd. of Elections*, 97 A.3d 1064, 1066 (D.C. 2014) (describing "two-step process" of D.C. Council passage and public referendum as one method for amending the District's Charter). The District counters that the Exemption Act simply modified procurement laws and involved no alteration of the Home Rule Act's requirements that those laws be followed. The trial court agreed with the District on the merits and granted summary judgment in its favor.

The District now argues, as it did below, that Mr. Carragher lacks standing to bring his suit. The trial court did not address this threshold standing question, but we cannot bypass it. *See Grayson v. AT&T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc) ("Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claim.") (citation omitted). We agree with the District that Mr. Carragher lacks standing. We vacate the trial court's grant of summary judgment and remand with instructions to dismiss the suit for lack of standing.

**I.**

Until recently, federal law prohibited sports gambling in all but a handful of jurisdictions. While Nevada and Atlantic City, New Jersey, are the most recognized exceptions to that longstanding prohibition, a federal statute has also long carved out (via a grandfathering clause) exemptions for Montana, Delaware, and Oregon. *See* 28 U.S.C. § 3704(a)(1)-(2); *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 556 (D.N.J. 2013) ("'grandfather clause' resulted in exceptions for four states: Delaware, Oregon, Montana, and Nevada. Additionally, New Jersey was the only state qualified to establish sports gambling within the one-year period" permitted by statute). The sweeping federal prohibition applicable to other jurisdictions was upended recently when the Supreme Court decided *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). *Murphy* held that federal restrictions precluding states from authorizing sports gambling violated the anticommandeering doctrine. *Id.* at 1475. That doctrine, in a phrase, "withhold[s] from Congress the power to issue orders directly to the States." *Id.*

With *Murphy* in the books, many jurisdictions—including the District— raced to launch sports gambling platforms. *See Legislative Tracker: Sports*

*Betting*, Legal Sports Report (visited Sept. 10, 2020), https://www.legalsportsreport.com/sportsbetting-bill-tracker/ https://perma.cc/TU2X-3PDF ("nearly 75% of US states have either legalized sports wagering or introduced legislation to do so" since *Murphy*). To establish a first-to-market advantage over neighboring jurisdictions, the District sought to surmount various legal hurdles that otherwise might have delayed its efforts.

The D.C. Council's first step was to pass the Sports Wagering Lottery Amendment Act of 2018, D.C. Law 22-312, 66 D.C. Reg. 1402 (codified principally at D.C. Code § 36-621.01 *et seq.* (2020 Supp.)). That Act authorized the District to establish its own online sports gambling platform "through contract with a limited number of partners" who would operate the underlying systems on behalf of the Office of Lottery and Gaming. D.C. Code § 36-621.11(a)(1-2). But impediments remained. Most notably, the Procurement Practices Reform Act of 2010 ("Procurement Act"), D.C. Code § 2-351.01 *et seq.*, required any contract for operating the District's gambling platform to be opened to competitive bidding, and a competitive bid process promised to delay the online platform's rapid launch. According to one estimate, a competitive bid process would have postponed any gambling platform's launch by about three years, which the Office of Lottery and Gaming figured would cost the District about $60 million in lost revenue. D.C.

Council Comm. on Fin. and Revenue, Report on Bill 23–25 at 2 (Jan. 30, 2019); *id.* attachment C at 6 (Jan. 28, 2019, testimony of Beth Bresnahan).

To prevent such delay, the D.C. Council's next step was to exempt the initial launch of a sports gambling platform from the Procurement Act's competitive bid requirements. In early 2019, the Council passed the Exemption Act, *supra*, which rendered the Procurement Act's competitive bid requirements inapplicable to "[t]he initial procurement contract" for sports gaming. 66 D.C. Reg. 2451. Shortly after the Exemption Act took effect, the District signed a sole-source contract with Intralot without ever opening that contract up to competitive bidding. Under the contract's terms, Intralot would run the District's sports gambling platform in exchange for a sizable percentage of the gambling proceeds.

Mr. Carragher brought suit in D.C. Superior Court claiming the D.C. Council, through the Exemption Act, impermissibly amended Section 424b of the Home Rule Act; that is something the D.C. Council is not empowered to do without ratification via a public referendum process. D.C. Code § 1-203.03(a). The Home Rule Act provision in question requires the District's Chief Financial Officer—who oversees the Office of Lottery and Gaming's procurement of goods and services—to follow statutory procurement requirements. D.C. Code § 1-

204.26 (2016 Repl.). The District did not dispute that it was obliged by the Home Rule Act to follow statutory procurement requirements, but maintained that the Exemption Act merely amended the District's procurement laws rather than the Home Rule Act's mandate that those laws be followed.

The trial court agreed with the District that the Exemption Act did not amend the Home Rule Act so that it did not require ratification via public referendum. The court further noted the Procurement Act itself expressly allows the District to deviate from competitive bidding requirements when "otherwise authorized by law," D.C. Code § 2-354.01, and held the Exemption Act was one such authorized deviation. The court thus concluded the Exemption Act lawfully altered the Procurement Act's requirements for the initial launch of a sports gambling platform, granted the District's motion for summary judgment, and dismissed Mr. Carragher's complaint with prejudice. The trial court's summary judgment order did not address whether Mr. Carragher had standing to bring his suit, though the District had repeatedly argued he did not.

## II.

On appeal the District renews its argument that Mr. Carragher lacks standing to maintain his suit. Although the District's courts were established under Article I

of the Constitution, D.C. Code §§ 1-204.31(a), 11-101, "this court has followed consistently the constitutional standing requirement embodied in Article III" of the Constitution. *Grayson*, 15 A.3d at 224. That means Mr. Carragher had the burden to demonstrate, among other things, that the conduct complained of caused him to suffer an "injury in fact" that is "concrete and particularized," "actual or imminent," and "fairly traceable to the challenged action." *Id*. at 246 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Mr. Carragher advanced two distinct theories of standing in the trial court, though he now relies almost exclusively on the second theory. First, he argued that he has "competitor standing" because of his interest in operating his own gambling platform in the District, an interest that he contends was thwarted by the District's award of a non-competitive contract to Intralot. *See generally District of Columbia v. Group Ins. Admin.*, 633 A.2d 2, 19 (D.C. 1993) (discussing competitor standing for the award of government contracts). Second, he argued that he has "municipal taxpayer standing" because, as a District resident and taxpayer, he has a cognizable interest in seeing that his tax dollars are not used unlawfully. *See generally District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 8-9 (D.C. Cir. 1988). We disagree on both points and conclude that Mr. Carragher does not have standing because, even if he were correct that the Exemption Act

illegally amends the Home Rule Act, he has suffered no injury as a result of that alleged illegality.

## A.

We start with Mr. Carragher's argument that he has competitor standing because, had the District followed preexisting procurement laws, he might have submitted his own potentially successful bid. That is a recognized theory of standing, but it is one that required Mr. Carragher to show that he was in a position to submit a viable bid to operate the District's gaming platform had the contract been opened to competitive bidding. *See generally Group Ins. Admin.*, 633 A.2d at 19 ("[A] disappointed bidder need demonstrate only that if its bid had been fairly and honestly considered, there was substantial chance that it would receive an award.") (citations, alterations, and internal quotations omitted). Mr. Carragher never made such an allegation below—much less one supported "through 'specific facts' set forth 'by affidavit or other evidence'" as required to establish standing at the summary judgment stage. *Grayson*, 15 A.3d at 246. That failure is fatal to his argument.

Mr. Carragher did not allege below that he wanted to operate the District's sports gambling platform, nor did he suggest that he would have submitted a viable

bid had the contract been opened to competitive bidding. Instead, the harm he alleged was his frustrated desire to launch his own "online sports betting platform designed to compete in D.C.'s sports wagering marketplace." But that marketplace does not exist. Nor would one have emerged in the event the District accepted competitive bids for awarding a contract *to operate its own platform.* Mr. Carragher's grievance is thus entirely divorced from any complaint he has about the Exemption Act's allowance of a non-competitive bid process. In other words, he has not suffered any injury traceable to the illegality he alleges. *Lexmark Intern., Inc. v. Static Control Components*, 572 U.S. 118, 125 (2014) (injury must be "fairly traceable to the challenged action"). The contract awarded to Intralot, which Mr. Carragher challenges, was to provide infrastructure and related services to assist the Office of Lottery and Gaming in launching its own sports gambling platform. Had that contract been opened to competitive bidding, Mr. Carragher would remain frustrated in his desire to enter the sports gambling market as an independent operator.

On appeal, Mr. Carragher aims closer to the mark, arguing that but for the Exemption Act, he "along with many others, could have competed for any available online sports betting contracts and licenses." But even interpreting that vague allegation to mean Mr. Carragher would have submitted a bid to operate the

District's gaming platform had it been opened to competitive bidding, it offers no help to Mr. Carragher here for two reasons: (1) "the time and place for factual development" on standing is "in the Superior Court," not here, *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 44 n.23 (D.C. 2015); and (2) "[w]hen a lawsuit reaches the summary judgment stage," as this one has, "standing must be shown through 'specific facts' set forth 'by affidavit or other evidence,'" *Grayson*, 15 A.3d at 246. Thus, even if we entertain and (very) liberally construe Mr. Carragher's belated and vague allegation that he "could have competed" in an open bidding process for operating the District's sports gambling platform, there is no evidence in the record that he actually would have submitted a bid or, had he done so, that his bid would have been viable. *Group Ins. Admin.*, 633 A.2d at 19 (prospective bidder must show "substantial chance" it would have been successful to satisfy standing requirements) (internal citations omitted). Because there was no evidence to support those points, Mr. Carragher lacks competitor standing.

**B.**

The stickier wicket[1] is Mr. Carragher's contention that he has municipal taxpayer standing. *See generally District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 4 (D.C. Cir. 1988). Unlike federal and state taxpayers—who typically do not, by their taxpayer status alone, have standing to challenge federal and state tax expenditures[2]—municipal taxpayers may have standing to challenge local expenditures provided their cause of action "'is a good-faith pocketbook action' complaining of 'a direct dollars-and-cents injury.'" *Vining v. Exec. Bd. of District of Columbia Health Benefit Exch. Auth.*, 174 A.3d 272, 279-

---

[1] A "sticky wicket" is a term derived from cricket, a sport that by some estimates has a betting market worth more than $100 billion per year. *Punters Spend a Trillion on Sport*, Bay of Plenty Times, Apr. 18, 2015, at B7 (cricket accounts for 12% of a global sports betting market worth more than $1 trillion). It refers to a damp or soft pitch that makes the ball bounce erratically, making it harder for the batsman, or batswoman, to hit.

[2] Such a grievance "is not 'concrete and particularized,' but instead a grievance the taxpayer 'suffers in some indefinite way in common with people generally.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (first quoting *Lujan*, 504 U.S. at 560; then quoting *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447 (1923)); *see also DaimlerChrysler Corp.*, 547 U.S. at 345 ("rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers").

80 (D.C. 2017) (quoting *Doremus v. Bd. of Educ. of the Borough of Hawthorne*, 342 U.S. 429, 434 (1952)).[3]

Mr. Carragher and the District disagree about what it means for a taxpayer to suffer a "dollars-and-cents injury" under this test, and more specifically, they disagree about whether an anticipated loss of tax *revenue*—as opposed to an illegal tax expenditure—confers standing upon a municipal taxpayer. The difference matters because Mr. Carragher contends the District would have realized more

---

[3] One reason offered for why municipal taxpayers have a stronger claim to standing than state or federal taxpayers is that there is a presumptively small number of taxpayers in a municipality so that a misuse of municipal taxes more directly impacts the taxpayer than would the misuse of state or federal taxes. *Frothingham*, 262 U.S. at 487 (federal taxpayer's interest in how federal taxes are spent "is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity"). The force of that rationale is suspect in municipalities like the District, which is more populous than some states (Wyoming and Vermont). *See American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 286 (6th Cir. 2009) ("Why residents of New York City necessarily have a greater stake in the way city officials spend their share of the city budget than North Dakotans have in the way state officials spend their share of the state budget may indeed be a head-scratcher."). And the entire doctrine of municipal taxpayer standing has been called into question as antiquated and inconsistent with modern standing doctrine. *See Common Cause*, 858 F.2d at 11-12 (Williams, J., concurring). Yet we have always adhered to it and have no cause to doubt its vitality now. Mr. Carragher simply does not satisfy its strictures for the reasons that follow.

revenue had the contract to operate its gaming platform been opened to competitive bidding.

In Mr. Carragher's view, a municipal taxpayer has suffered an injury, sufficient for standing purposes, whenever he can demonstrate that the complained-of act caused a "loss of revenue," citing to federal circuit court cases articulating that view. *Common Cause*, 858 F.2d at 5; *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 210 (6th Cir. 2011) (en banc). That is, Mr. Carragher argues if the District could have generated more revenue by opening the Intralot contract up to competitive bidding, that is enough to substantiate his injury for standing purposes. In the District's contrary view, a mere loss of potential revenue is not a cognizable injury to the generic municipal taxpayer. Instead, the District cites binding precedent for the proposition that "if the municipality's [allegedly] unlawful expenditure is not funded by . . . taxes," then there is no injury for municipal taxpayer standing purposes. *Vining*, 174 A.3d at 280; *see also Debevoise v. Back*, 359 A.2d 279, 280 (D.C. 1976). In other words, if there is no direct "link between [the taxpayer's] municipal taxes and the challenged municipal expenditure," then "municipal taxpayers do not have standing to sue to enjoin municipal expenditures when no tax moneys are spent." *Vining*, 174 A.3d at 280 (citation and internal quotations omitted).

The District has the better of the argument for the simple reason that *Vining* and *Debevoise* are binding precedents, whereas the cases Mr. Carragher relies upon are not. Putting non-binding precedents aside,[4] *Vining* states unequivocally that "a municipal taxpayer does not have standing to sue to prevent expenditures if his tax dollars do not contribute to them." 174 A.3d at 281. Mr. Carragher does not argue that the repeated statements to that effect in *Vining* are non-binding dicta; in fact, he does not mention *Vining* at all in response to the District's argument that it is fatal to his claim of standing. Yet even if *Vining* is not dispositive—for instance, because our discussion on this point did not consider whether lost tax revenues might constitute an injury for municipal taxpayer standing purposes[5]—it would do Mr. Carragher no good. Our earlier opinion in *Debevoise* squarely confronted this

---

[4] Notably, while Mr. Carragher highlights language from *Common Cause* suggesting a mere loss of revenue may constitute an injury to the municipal taxpayer, that case elsewhere states that "municipal taxpayers do not have standing when no tax moneys are spent." 858 F.2d at 4; *see also Vining*, 174 A.3d at 280 n.35 (collecting cases stating that municipal tax dollars must be spent on the challenged expenditure to give rise to municipal taxpayer standing). We do not need or attempt to resolve any potential internal contradiction in *Common Cause* because it is not binding on us.

[5] *Vining* concerned an allegation that municipal funds were illegally spent, yet those funds were not municipal tax dollars at all, but instead "federal grant monies and assessments." 174 A.3d at 277. Thus, *Vining* did not squarely confront the question whether illegally diminishing prospective tax revenues—rather than illegally spending tax dollars—might constitute an injury under the municipal taxpayer standing doctrine.

issue, where the plaintiff claimed the District's agents were illegally declining "to collect taxes from suburban banks" and, had those taxes been collected, "her tax bills might be reduced or her municipal services improved." 359 A.2d at 280. We held that failure to generate tax revenue did not give rise to municipal taxpayer standing because it involved no "misuse or misappropriation of" municipal taxes, so that the plaintiff's suit intruded "into the political issues of revenue collection." *Id.* at 280. So too here.

The distinction between illegally spending tax dollars versus illegally diminishing revenues that would otherwise flow into the municipal fisc is a slippery one,[6] but we have previously drawn that line and, policing it here, find it to be dispositive. The record demonstrates that the Intralot contract that Mr. Carragher now seeks to invalidate is not funded by municipal tax dollars, but is instead funded by gaming revenues. While Mr. Carragher says he "disagree[s]"

---

[6] Some courts and jurists have suggested there is little conceptual difference between the harm that befalls a taxpayer in the two scenarios. *See Johnson v. Economic Dev. Corp. of Cty. of Oakland*, 241 F.3d 501, 507-09 (6th Cir. 2001) (refusing to distinguish an unlawful expenditure from an unlawful loss of public revenue for purposes of state taxpayer standing because both injure or threaten the taxpayer's financial interest); *cf. Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 148 (2011) (Kagan, J., dissenting) ("Precisely because appropriations and tax breaks can achieve identical objectives, the government can easily substitute one for the other."). But *Debevoise* and *Vining* have enshrined this distinction in our precedents and we are not free to second-guess it.

with that as a factual matter, he points us to no record evidence that would make it a "genuine issue of material fact" sufficient to survive summary judgment. *See Tillery v. District of Columbia*, 227 A.3d 147, 150-51 (D.C. 2020) (summary judgment appropriate when "there is no genuine issue of material fact") (citation and internal quotations omitted). So even if we assume Mr. Carragher substantiated his claim that the Intralot contract is "more costly than a contract that is competitively bid," that would show only a diminishment of expected revenues from the challenged gaming contract. It does not show the allegedly unlawful contract is "funded by . . . taxes," which is the burden he had to carry under *Vining* and *Debevoise* to establish municipal taxpayer standing. *Vining*, 174 A.3d at 280.

## III.

We vacate the trial court's judgment and remand with instructions that it dismiss the suit for lack of standing.

*So ordered.*